# Participation of the Vice President in the Affairs of the Executive Branch

There is no general bar, either of a constitutional or statutory nature, against the President's transfer of duties to the Vice President; however, where, by the nature of the duty or by express constitutional or statutory delegation, the President must exercise individual judgment, the duty may not be transferred to anyone else.

In foreign relations, at the will and as the representative of the President, the Vice President may engage in activities ranging into the highest levels of diplomacy and negotiation and may do so anywhere in the world.

In matters of domestic administration, the nature and number of the Vice President's executive duties are, as a practical matter, within the discretion of the President, with the recent and important exception of statutory membership on the National Security Council. Since the Vice President is not prevented either by the Constitution or by any general statute from acting as the President's delegate, the range of transferrable duties would seem to be co-extensive with the scope of the President's power of delegation.

March 9, 1961

MEMORANDUM OPINION FOR THE VICE PRESIDENT

This memorandum is in response to your recent request concerning the extent to which the Vice President may properly perform functions in the Executive Branch of the government.

The Constitution allots specific functions to the Vice President in the transaction of business by the Legislative Branch of the government (art. I, § 3) but neither grants nor forbids him functions in the conduct of affairs of the Executive Branch. The extent to which he may properly take part in those affairs must be assessed primarily in terms of historical precedents.[1] The courts have not had occasion to consider this matter and judicial precedents do not exist.

## I. Presidential Powers of Delegation

As will be seen below, the role of the Vice President in the Executive Branch has varied greatly through the years and at any given time has been determined largely by the President. A brief reference to the latter's powers of delegation is thus pertinent. It has long been recognized that the President has the power to

---

[1] There is no inherent conflict between the legislative role given to the Vice President by the Constitution and any executive duties he may be called upon to carry out. As pointed out by one writer, "[t]he Founding Fathers never intended to immobilize the second officer in the chair of the Senate, for they empowered that body to choose a President *pro tempore*, in the absence of the Vice President." Irving G. Williams, *The American Vice-Presidency: New Look* 70 (1954) (internal quotation marks omitted). Nixon once estimated that he spent only ten percent of his time presiding over the Senate. *Nixon: Likes His Job—Happy, Working Hard*, U.S. News & World Rep., June 26, 1953, at 71.

delegate tasks for which he is responsible and that "in general, when Congress speaks of acts to be performed by the President, it means by the executive authority of the President." *Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 467 (1855) (Cushing, A.G.). In 1950, Congress expressly gave the President broad authority to delegate to department and agency heads, and to certain lesser officials, functions vested in him by law if such law did not affirmatively prohibit delegation. Pub. L. No. 81-673, 64 Stat. 419 (codified at 3 U.S.C. §§ 301–303). This legislation, which was designed to lighten the burden of the President by permitting him to slough off without question a substantial number of tasks thought by some authorities to require his personal attention,[2] recognized the "inherent right of the President to delegate the performance of functions vested in him by law" and specifically disavowed any intention to limit or derogate from that right. 3 U.S.C. § 302. Thus, there is no general bar, either of a constitutional or statutory nature, against the President's transfer of duties to the Vice President. It remains to be noted, however, that

> [w]here . . . from the nature of the case, or by express constitutional or statutory declaration, it is evident that the personal, individual judgment of the President is required to be exercised, the duty may not be transferred by the President to anyone else.

3 Westel Woodbury Willoughby, *Constitutional Law of the United States* § 961, at 1482 (2d ed. 1929).

The President's obligation to pass on bills sent to him by Congress is one example of a non-delegable duty. The exercise of judgment required by 49 U.S.C. § 1461 in the matter of the certification of overseas air transport routes may well be another.

## II. History

The history of the Vice Presidency begins with the last period of the Constitutional Convention of 1787.[3] During most of the Convention the delegates had sought to perfect a plan whereby the Congress would elect the President and, if necessary, his successor to fill an unexpired term. However, dissatisfaction with this method ultimately led to the creation of the Electoral College and the office of Vice President. Under the original provisions of the Constitution (art. II, § 1) each elector voted for two persons for President, and the person receiving the highest

---

[2] S. Rep. No. 81-1867 (1950).

[3] The brief history set forth in the following portion of this memorandum has been digested mainly from the work of Irving G. Williams (*supra* note 1) and a later and expanded work by the same author, *The Rise of the Vice Presidency* (1956). Attached as an appendix to this memorandum is a list containing other recent source material bearing on the office of the Vice Presidency.

number of votes became President if such number was a majority of the whole number of electors appointed by the States. The runner-up in the balloting became Vice President. The present system of separate electoral balloting for the offices of President and Vice President was established following the tie in the electoral vote of 1800 between Jefferson, who was the first choice of the Republican Party of the day, and Burr, also a Republican, intended by his Party for the Vice Presidency. Burr's refusal to step aside together with the tactics of the strong Federalist bloc in the "lame duck" House of Representatives into which the election was thrown necessitated 36 ballots before Jefferson was elected. This crisis, which was the outcome of the unforeseen growth of the party system, four years later produced the Twelfth Amendment requiring the members of the Electoral College to vote for one individual for President and another for Vice President.

John Adams, the first Vice President, was one of the most influential. He originally conceived of his Constitutional duties in the Chair of the Senate as tantamount to leadership, and, to some extent because of the great number of casting votes occasioned by the small roster of the Senate, played a decisive part in its work during the first few years of its existence. Later, as it increased in membership and its organization and procedures were strengthened, his influence was greatly diminished. On the executive side, he enjoyed Washington's confidence and was consulted by him frequently, particularly in regard to diplomatic matters. However, despite his extensive experience in diplomacy abroad, Adams in 1794 rejected a suggestion that he travel to England to negotiate a commercial treaty, taking the position that the Constitution required him to preside over the Senate. In addition, he questioned the propriety of leaving the country in view of the necessity of his taking over the Presidency in case the office became vacant. This dubious precedent, followed in 1797 by a similar refusal by Jefferson to carry on diplomatic negotiations in France when he was Vice President under Adams, held good until 1936 when Garner made trips to the Far East and to Mexico on official business.

The Twelfth Amendment had a prompt and unfortunate effect on the Vice Presidency as appears from the contrast between the abilities and attainments of Adams, Jefferson and Burr, who held it prior to the adoption of the Amendment, and the lackluster of Clinton, Gerry, and Tompkins, who served during the next two decades. Calhoun and Van Buren, the next occupants of the office, lent great prestige to it, but not Van Buren's successor, Richard M. Johnson, whose main claim to distinction seems to be that he failed of a majority in the Electoral College and become the only Vice President in the country's history to be elected by the Senate. John Tyler, the next Vice President, served a term of one month, succeeding to the Presidency upon the death of William Henry Harrison on April 4, 1841, the first of a Chief Executive in office. Tyler took the presidential oath believing and contending that the office of President had devolved on him

and not merely its powers and duties.[4] Many members of the Congress and others, including former President John Quincy Adams, took sharp issue and argued that Tyler was merely "acting" President. Whatever the merits of the controversy, Tyler's position prevailed. All Vice Presidents succeeding to the Presidency after him followed his lead, and his view was written into the Constitution by the language of the Twenty-Second Amendment.

From Tyler's time to that of Woodrow Wilson, the office of the Vice Presidency by and large played an unimportant part in the government except for providing Fillmore, Andrew Johnson, Arthur and Theodore Roosevelt as successors to the Presidency upon the deaths of Taylor, Lincoln, Garfield and McKinley.

Thomas R. Marshall, Vice President during both of Wilson's terms, brought the office back into public esteem and ultimately became the most popular Vice President up to his time. The first after Calhoun to win reelection, Marshall was also the first after John Adams to attend a Cabinet meeting. Adams had sat in at a meeting in 1791 on Washington's request while the latter was on a tour of the South. Similarly, at the request of Wilson, concurred in by the Cabinet, Marshall presided over its meetings during Wilson's attendance at the Paris Peace Conference. The temporary seat in the Cabinet afforded to Marshall became Coolidge's permanent seat at the invitation of Harding. On the other hand, Dawes, who was Vice President during Coolidge's elected term, refused to follow his example and attended no meetings of the Cabinet whatever. Curtis was not asked to sit during Hoover's term and it was only after the election of Franklin D. Roosevelt, and beginning in 1933 with Garner, that participation by the Vice President in the deliberations of the Cabinet became a matter of course.

What has been called the "contemporary renaissance" of the Vice Presidency[5] stems in large part from the second Roosevelt's reliance on the men who served in that office during his administrations. Garner's aid to Roosevelt was important in his first term, particularly in the area of congressional liaison. Garner also made his presence felt in the Cabinet and, further, was often asked by Roosevelt for his views on matters of foreign policy. As mentioned above, Garner broke the negative precedent set by the first Adams, and in 1936 became the first Vice President in office to travel beyond the country's borders in an official capacity.

By the end of his first term, Garner began to have misgivings about the New Deal and by the middle of his second he was completely out of sympathy with Roosevelt's policies. In the last days of 1938 both Roosevelt and he recognized that they had come to the parting of the ways and at the close of 1939 Garner

---

[4] Article II, Section 1 of the Constitution provides that "In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the same shall devolve on the Vice President . . . ." Tyler took the position that the word "same" related back to the word "Office."

[5] Williams, *American Vice-Presidency*, *supra* note 1, at 9.

announced himself a candidate for the Presidency in the election of the following year. Although Garner continued to attend Cabinet meetings until the expiration of his second term, he obviously was little more than an observer after 1938. Thus, the powerful and useful partnership of the President and Vice President, probably without prior parallel except for the Washington-Adams relationship, came to an unfortunate end after some five years and the Executive Branch reverted to a sole proprietorship.

During Roosevelt's third term the executive partnership with the Vice Presidency was revived and Wallace received responsibility and power in measures never known to a Vice President before and, in certain aspects, not known to one since. Only in the more or less traditional task of congressional liaison were Wallace's activities limited—and then not because of a presidential interdiction but rather by reason of Wallace's lack of talent for and interest in this facet of the Vice President's work.

Wallace's major duties in the Executive Branch began on July 30, 1941, when the President issued Executive Order 8839 (6 Fed. Reg. 3823, 3823) creating the Economic Defense Board composed of the Vice President, who was designated Chairman, and several Cabinet officers. The stated purpose of the Board was to develop and coordinate "policies, plans, and programs designed to protect and strengthen the international economic relations of the United States in the interest of national defense." Four weeks later, Executive Order 8875 of August 28, 1941 (6 Fed. Reg. 4483, 4484) created the Supply Priorities and Allocations Board ("SPAB"), consisting of the Chairman of the Economic Defense Board (Wallace), a number of Cabinet officers, and the heads of a number of emergency agencies. Wallace was named Chairman of the SPAB presumably to coordinate the domestic and international economic defense programs. Finally, Wallace was made a member of a presidential advisory committee on atomic energy created in October 1941, together with Secretary of War Stimson, Chief of Staff Marshall, Dr. Vannevar Bush, and Dr. James B. Conant. According to Stimson, this committee was the basic agency for making major policy decisions on the development and use of atomic energy.

Wallace's work on the SPAB was of relatively short duration because the Agency was abolished shortly after Pearl Harbor and replaced by the greatly expanded War Production Board with Donald Nelson, the Executive Director of the superseded SPAB, as its full time Chairman. Wallace's membership on the atomic energy committee continued throughout his whole term but because of the secret nature of the committee it is of course impossible to evaluate his contribution to its work.

It was in the first of his major Executive Branch assignments, the Economic Defense Board (renamed the Board of Economic Warfare ("BEW") a few days after Pearl Harbor), that Wallace had responsibilities and carried out duties unique in the history of the Vice Presidency. The order setting up the Board had directed

that the administration of economic defense activities in the international field by the various government departments and agencies "shall conform to the policies formulated or approved by the Board." Exec. Order No. 8839, 6 Fed. Reg. at 3823. Thus, owing to the scope of the activities embraced within the concept of "economic defense," Wallace in a variety of situations became the superior of every Cabinet officer and most of the important independent agency heads. The ubiquity of the BEW and the boldness and tenacity of its staff embroiled it soon after Pearl Harbor in a series of running battles over policy with other government agencies, including specifically the Department of State and the Reconstruction Finance Corporation. The course of these battles need not be detailed here and it is enough to note that conflicts with the latter two powerful agencies led to the BEW's downfall. In the summer of 1943 the President removed Wallace as its Chairman and then terminated it.

It is generally agreed that the BEW performed its work well and substantially furthered the war effort. Its demise is therefore not to be laid to any difficulties inherent in the dual role of Vice President and Chairman played by Wallace. The real trouble was frequent policy disagreement reflecting a clash of Wallace's liberal views with the relatively conservative views of Secretary of State Hull and RFC Chairman Jones.

In addition to his domestic duties Wallace undertook tasks farther afield. Continuing Garner's example, he made several trips to Latin America as a good-will ambassador and in 1944 traveled to the Far East on a combined political and good-will mission.

Following Wallace, Truman sat with the Cabinet during his short service as Vice President, as did Barkley after he became Vice President in 1949. In the same year Congress at the request of Truman made the Vice President a statutory member of the National Security Council. National Security Act Amendments of 1949, Pub. L. No. 81-216, § 3, 63 Stat. 578, 579 (codified at 50 U.S.C. § 402(a)). Thus, the combination of Cabinet and National Security Council service placed the Vice President in a position to keep informed about the most important affairs of the nation and to join in the making of policy at the highest levels.

Nixon carried out perhaps a greater variety of duties than any of his predecessors. In his first year of office he became and thereafter remained Chairman of the President's Committee on Government Contracts. He attended and in the absence of the President presided at Cabinet meetings and meetings of the National Security Council. He acted as a "trouble-shooter" for the White House in its dealings with Congress and in matters political. And he was prominent in the field of foreign relations, traveling in other lands to an extent much greater than any of his predecessors and apparently having a significant voice from time to time in the Eisenhower Administration's formulation of foreign policy.

From this brief outline of the history of the Vice Presidency, it is apparent that during the past half century, and markedly since 1933, the office has moved closer

and closer to the Executive. This development, aided by the deference of the party nominating conventions to their presidential nominees in the selection of running mates, is easily understandable when related to the enormous increase in the responsibilities and burdens of the Presidency which took place concurrently.

### III. Limits of Vice President's Part in Work of Executive Branch

In considering what the proper limits of the role of the Vice President in the Executive Branch may be, it is convenient to discuss separately the two areas of foreign affairs and domestic administration. In the former area, it is evident that at the will and as the representative of the President, the Vice President may engage in activities ranging into the highest levels of diplomacy and negotiation and may do so anywhere in the world.[6] The refusal of John Adams during the Washington Administration to engage in such activities abroad cannot be given any weight at the present time. His reasons, good or bad as they were, have been obviated by the fact that lengthy absences of the Vice President from the Senate have become the custom and not the exception and the fact that, even if abroad, the Vice President would today be able to return to the seat of government within hours in the event the office of President became vacant. Indeed, Adams either advanced the reasons merely as an excuse or soon changed his mind, for the day before his own presidential administration began he asked Vice President-elect Jefferson to undertake the same kind of task he himself had declined. Jefferson's rejection of the request, ostensibly based on Adams's own grounds, was really motivated by political considerations.[7] At any rate, aside from location, the propriety of assignments to the Vice President in the field of foreign relations was plainly taken for granted in the beginning years of our history and justifiably so in the absence of any constitutional proscription, express or implied. Nothing that has occurred since then suggests that this earlier assumption was incorrect.

In matters of domestic administration, the nature and number of the Vice President's executive duties, with the recent and important exception of statutory membership in the National Security Council, are, as a practical matter, within the discretion of the President. Since the Vice President is not prevented either by the Constitution or by any general statute from acting as the President's delegate, the range of transferrable duties would seem to be co-extensive with the scope of the President's power of delegation. The outer limits of that range were approached, if not touched, by Wallace's post as Chairman of the BEW. Although that presiden-

---

[6] For a discussion of the President's right to employ diplomatic agents without the concurrence of the Senate despite his obligation under Article II, Section 2, Clause 2 of the Constitution to submit for its advice and consent his nominations of "Ambassadors, other public Ministers and Consuls," *see* Legislative Reference Serv., Library of Cong., *The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 82-170, at 447–49 (Edward S. Corwin ed., 1953).

[7] Williams, *Rise of the Vice Presidency*, *supra* note 3, at 25.

tial assignment was the outgrowth of war, there is no visible bar to commensurate posts for the Vice President in other times.

The Vice President's formal domestic assignments from the President in recent years—that is, his seat with the Cabinet and his chairmanship of the Committee on Government Contracts—are beyond doubt consistent with the Constitution and laws. The statutory duty of the Vice President as a member of the National Security Council is to advise the President. 50 U.S.C. § 402(a). Thus, the Vice President's affiliation with that body partakes of the same character as his service with the Cabinet and raises no constitutional questions. The same would be true of his statutory membership on the advisory National Aeronautics and Space Council (42 U.S.C. § 2471(a)) if, as the President recently stated he would recommend to Congress,[8] the latter body were to amend the present law to provide for such membership.

A caveat is appropriate with respect to bestowals of functions upon the Vice President by Congress. To the extent that legislation might attempt to place power in the Vice President to be wielded independently of the President, it no doubt would run afoul of Article II, Section 1 of the Constitution, which provides flatly that "[t]he executive Power shall be vested in a President of the United States." Furthermore, since the Vice President is an elective officer in no way answerable or subordinate to the President, the practical difficulties which might arise from such legislation are as patent as the constitutional problem.

## IV. Separation of Powers

In the course of the brief discussion of the office of the Vice President at the Constitutional Convention, some of the delegates complained that making him the presiding officer of the Senate would blur the separation of powers between the Executive and Legislative Branches. In particular, they seemed to fear that the President would somehow gain ascendance over the Senate through the Vice President.[9] Inasmuch as the chair of the Senate has had a relatively unimportant part in its proceedings since the time it was held by John Adams, this complaint has proved groundless. Thus, active as a Vice President may be in the conduct of the business of the Executive, it is difficult to perceive that as a practical matter his service in the Senate would diminish the powers of the Legislature. However, in the event that the Senate were to take up a bill affecting a specific executive activity the Vice President was engaged in, it would of course be the better part of decorum and prudence for him to absent himself from the chair.

---

[8] The President's News Conference of March 1, 1961, *Pub. Papers of Pres. John F. Kennedy* 135, 138 (1961).

[9] Williams, *Rise of the Vice Presidency*, *supra* note 3, at 19.

Aside from practicalities, it does not appear that doctrinal considerations block the Vice President's performance of important functions in the Executive Branch. Despite his position as President of the Senate, he is certainly not one of its members.[10] Nor can he be convincingly described as a third member of the Legislative Branch alongside the two houses of Congress. His office was created by Article II of the Constitution dealing with the Executive Branch, and Section 4 of that article makes him, just as the President, subject to impeachment by the Legislative Branch. Since the power of impeachment is a check devised to safeguard the principle of separation of powers against depredations by the Executive, it is troublesome conceptually to categorize the Vice President as a member of the Legislature.

Perhaps the best thing that can be said is that the Vice President belongs neither to the Executive nor to the Legislative Branch but is attached by the Constitution to the latter. Whatever the semantic problems, however, they would not seem to be especially relevant to the question whether the President or Congress may designate the Vice President to undertake executive responsibilities. As Mr. Justice Holmes once noted in a similar context, "[t]he great ordinances of the Constitution do not establish and divide fields of black and white. Even the more specific of them are found to terminate in a penumbra shading gradually from one extreme to the other."[11] If a judicial test of the employment of the Vice President in the affairs of the Executive were ever to occur, there is little reason to think that it would be decided purely on the basis of abstractions. To the contrary, the comparative silence of the Constitution in regard to the Office of the Vice President virtually guarantees that the decision would be based primarily on considerations of practice and precedent. In short, theoretical arguments drawn from the doctrine of separation of powers merit little attention in the face of history, like that to the present, disclosing that the Office of the Vice President has become a useful adjunct to the Office of the President without causing harm to the Legislative Branch.

## V. Conclusion

To sum up, what was once essentially a bare waiting room for the Presidency has become a lively office participating more and more in the affairs of the

---

[10] Article I, Section 6, Clause 2 of the Constitution provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." Since the Vice President holds "an Office under the United States," it would do violence to this language to argue that the Founding Fathers conceived of him as a member of the Senate. Moreover, Clauses 1 and 2 of Article I, Section 5, which provide that each House shall be the judge of the elections, returns, and qualifications of its own members and may punish and expel them, plainly do not apply to the Vice President.

[11] *Springer v. Philippine Islands*, 277 U.S. 189, 209 (1928) (dissenting).

Executive. Such participation has not threatened the unity of the Executive. Unless it should do so in the future, it will not meet a constitutional bar.

NICHOLAS deB. KATZENBACH
*Assistant Attorney General*
*Office of Legal Counsel*

APPENDIX

## Select Bibliography of Recent Material on the Vice Presidency

### Books

Peter R. Levin, *Seven by Chance: The Accidental Presidents* (1948).
Ruth C. Silva, *Presidential Succession* (1951).
Irving G. Williams, *The American Vice-Presidency: New Look* (1954).
Irving G. Williams, *Rise of the Vice Presidency* (1956).
Edgar Wiggins Waugh, *Second Consul* (1st ed. 1956).

### Articles and Other Material

Clinton L. Rossiter, *The Reform of the Vice-Presidency*, 63 Pol. Sci. Q. 383 (1948).
G. Homer Durham, *The Vice-Presidency*, 1 W. Pol. Q. 311 (1948).
Lucius Wilmerding, Jr., *The Vice Presidency*, 68 Pol. Sci. Q. 17 (1953).
Martin Packman, *Vice Presidency*, 1 Editorial Res. Rep. 239 (1956).
*Administrative Vice President: Hearings Before the Subcomm. on Reorganization of the S. Comm. on Government Operations*, 84th Cong. (1956).
Subcommittee on Reorganization, S. Comm. on Government Operations, *Proposal to Create an Administrative Vice President*, S. Rep. No. 84-1960 (1956).